We do group cases like cases for arguments, so this was not just a pure coincidence that we're dealing with the same subject matter. Exactly. May it please the Court, my name is Michael Barry with the Law Firm of Grant & Eisenhoffer in Wilmington, Delaware. And I was very intrigued by the prior argument. I'd like to reserve two minutes for rebuttal. Sure. Like the last case, this involves a claim under Section 14A on state law disclosures relating to shareholder votes to approve certain compensation plans. As alleged in the complaint, the votes challenged, the challenged votes approved compensation plans that reserves fortunes to company employees approximately 20 percent of the outstanding stock of Apple Corporation. The trial court below committed three fundamental errors in its decision. First, it completely ignored the nature of the injury that was being claimed. A Section 14A claim and a state law disclosure claim, both of which are at issue here and which were at issue in the last case that was just argued, protects the interest and the right of fair corporate suffrage. Apparently, unlike the trial court in the case below, the trial court here completely ignored that issue. The trial court here said it completely misconstrued the nature of the claim. Not only did the Court not even acknowledge the existence of the right of shareholder suffrage, the Court said instead that what this case really was about was the issuance of backdated options. And there is not a single claim or a single allegation in the complaint in this case that challenged the issuance of a single backdated option. The claim that was asserted was that the shareholders of Apple were duped into approving these compensation plans by the representations that the company was being responsible and how they were paying out stock options. So they approved the issuance of these plans and these – and reserved for issuance the company employees approximately 20 percent of the outstanding shares. The district court's – The plaintiff was damaged thereby? Yes. It gets to a – What way? It gets to a – well, first, they were damaged because they were deprived of the right to a fully informed vote. They were damaged. That states – that states a direct cause of action that was ignored by the district court. All right. Now, what's the – so that brings up the next question. All right. You were damaged. All right. That states a direct claim. So the entire argument that it's derivative is wrong. It's a direct claim. So the next question is, what was your damage? Well, you look at it. All right. You've made the vote, and you were – and you were injured because you were deprived of the right to cast that fully informed vote. The next question is, was there an economic consequence that followed from that? The answer is yes. The economic consequence that followed from that is I've now reserved 20 percent of the outstanding shares for company employees. And the issuance of any options under those plans, any shares under those plans, dilute the interests of the – of the injured shareholders. So why does that necessarily mean that your clients had an economic loss? Oh, because dilution, by definition – Does it? I mean, the shares go up. It doesn't make any difference, does it? Oh, that's absolutely not true. Absolutely not true. Why? As we explained in – as we explained in the hypothetical we set forth in our brief, for example, if I have 100 – if this corporation is worth $100 and there's four shares outstanding, then each one is worth $25. Let's say that the CEO who has one of those shares says, I want shareholder approval to issue me another share of stock because I'm undercompensated and I'm doing a great job and everything else. And the shareholders say, you know, you are doing a great job. I'm going to approve the issuance of that outstanding share. So now we've got five shares. Each one is worth $20. Well, let's assume, for example, that the stock – that the company does terrific and now it's worth a $500 company. Each shareholder still only has one-fifth of that company when otherwise they would have had one-fourth of that company. So they still suffered an economic injury even if the stock price goes up. The injury is that I now have less of a percentage in the outstanding – in the outstanding percentage equity ownership of that company. That's the economic consequence of allowing you to issue those stocks to those employees. How that's remedied is a question for the district court. How that's remedied is a question that under Mills, the Supreme Court's decision in Mills, you have to look at the Ninth Circuit's argument in Yamamoto. Let's look at Yamamoto, for example. Mr. Verrilli. The first on whether or not there was any drop or increase in the market price. Let's suppose the shares went up. Yep. Okay. Then the plaintiff can't say, well, I was injured because my shares are now worth more than they were before as a result of this breach of the direct obligation. They can't say that. So he can say, well, my shares are now worth less because I own less of all of the assets of the corporation. Dilution. That's what you're talking about. That's exactly the point. Now, then you say, well, okay, how are you ever going to get to prove that you're going to get less money? Well, if the corporation were dissolved and everybody were to pay off all of its creditors and all of the rest, then whatever is left over would be divided among the shareholders. And now instead of having 25 percent of it, I've only got 20 percent under your hypothetical. Okay? But to get down to that point, wouldn't there be some sale by the company of its assets or whatever that had a reflection in the market value? Yeah. Or is that too complicated to even guess at? Your Honor, you don't have to get that far. You don't have to get that far. The issue is the simple point is a financial expert can do an economic calculation as to what the dilutive effect of the issuance of X number of outstanding shares may be. Doesn't your argument only work in a closely held corporation? No. I mean, when you have a publicly traded corporation and the stock value is driven by perhaps irrational exuberance, to coin a phrase, what difference does it make, really, on dilution? In terms of real economic terms. That's a question, honestly, that the district court should look at. That's a question that the district court should say, show me your evidence. Show me your damages analysis. Get me the event study that shows the movement on the stock price as new shares were issued by the company. Show me that. That's exactly the inquiry that the district court should be making. That's an inquiry that the district court completely ignored. But you're right. That is a question. What is the impact of that dilution? What is the financial impact? Let me have expert testimony on that. All right. But that's your obligation. And it's my obligation. I'm ready to do it. We're just asking, I think, in different ways. I expect to prove this. Because I can present expert analysis that says that upon the issuance of X numbers of outstanding shares, it has a Y effect on the stock price, or that by virtue of the reservation of other shares, that you've now impacted the overall equity of the corporation, the market cap, by X dollars. These are questions that, frankly, are beyond me. That's why I hire experts to look at them. But it's an inquiry that isn't here. It's at the trial court. It's at the trial court that lets me present the evidence of the damage. Now, the issue is the unscrambling the eggs. And my previous colleague made reference to the fact that Delaware comes up with analyses. First off, let me be clear. At least in our case, we haven't asked for a single outstanding and issued option to be canceled. We've only said if you've – any unissued options, cancel them. Any stock options – stock shares that have been issued and exercised pursuant to an improperly reserved plan, that might cause damage through dilution. And I can talk about how to quantify that. But Delaware law, and to the extent where Delaware applies, because we're talking about, first off, at least in the first section, Section 14A, but to the extent you want to look at Delaware law and how they do things, in a stock-for-stock transaction, for example, where there's a merger and you can't unscramble the proverbial eggs, what the Court does do is it says, well, what's the – what's the impact on the value? And I can award money damages for the – for the stock shareholders who were shortchanged in the distribution and the dilution of how they were – how the stock in the new corporation was shared. You can calculate money damages that way. It's complex, yes, but it's possible. And Mills says that once you have a violation of the – of the right to cast a fully informed vote, it's incumbent on the district court to fashion appropriate remedy. My colleagues to my right not only ignore that. They say, well, Dura and the PSLRA overruled that, to the extent that Yamamoto and Borak said that. They don't actually mean it anymore because the PSLRA and Dura changed all that, which gets to the second error of the district court on the loss causation issue. They say, well, without a – without a fall in the stock price, you can't have a claim under Section 14A or anything else in the securities laws for that matter. Well, that's just wrong. First, Tell Labs made clear that Borak stands on equal footing with the PSLRA and Dura in the first sentence, in the first paragraph of Tell Labs. Okay. So what does that mean? How do you – how can you satisfy the requirement of a loss causation? You don't have to have a stock price drop. 10b, under Dura, perhaps you do. Perhaps. Under 14A, where the injury isn't that I bought price – stock at an inflated price, the entire analysis on that part of Dura doesn't really apply. I'm not saying I was injured because I bought stock at an inflated price and, therefore, was suffered when the stock price declined. My claim is I was injured when I was deprived of that right to an informed vote. So what's the economic consequence? And I explained the economic consequence can be dilution. The defendants here twist – twist the issue. They say – they say look at Delaware law. First off, forget Federal law. We'll ignore the controlling Supreme Court authority at this moment. But let's look at Delaware law. And Delaware law says that in claims of dilution, they're only direct. You can only pursue claims – dilution claims if – if there's a controlling shareholder. That's the transactional paradigm that they – that they keep going over. The problem with that analysis is that the entire body of case law that you're talking about in there hinges on the idea of the dilution being caused by corporate overpayment. You paid too much. You issued the stock options. That's the Langford case that they just cited in the supplemental authority. And by – if you're claiming that you paid those employees too much because they were backdated, the corporation is the one that's overpaying. And that's exactly how the district court analyzed this. You paid too much through the issuance of backdated stock options. That's not it. The Delaware courts recognize that in corporate overpayment cases, there is this one And at least in some – in some respects, in the Gertz case, for example, you don't need a controlling shareholder. But that's the transactional paradigm they're talking about. Where, however, the underlying case – the underlying claim is not derivative, that transactional paradigm doesn't – doesn't – isn't implicated. Let me – let me explain it this way. Cooley holds that the mere fact that shareholders were diluted does not transform a derivative claim, a classic derivative claim into a direct claim merely because dilution happens. On the same claim, the fact that dilution happens doesn't transform a clearly direct claim into a derivative claim merely because the end result is – is shareholder dilution. That's the fundamental problem with their analysis. That's the fundamental problem with the treatment of Cooley. It's a two-way street. You look at the nature of the claim and where the remedy goes. The nature of the claim here is you violated my voting rights. Where does the remedy go? Cancel the stock plans, rescind the – the reserved but unissued stock to restore my right, the rescissionary damages that I've sought in the wherefore clause of the complaint. Or, to the extent that's not possible, let's talk money damages to me for the – for the reasons that you issued. You took it upon yourself to issue shares that should never have been reserved. I'm running quickly out of time, but I wanted to quickly get into the denial of the motion to amend. The London Waiver Rule has no application at the district court level where you've made a motion to amend under 15a. The district court in this case held that all the relevant factors under 15a to be considered, counseled in favor of allowing amendments to start a 10b claim. So, to the extent discretion applies, she's already – the district court has already said that it – that it – that they ought to be allowed to amend under 15a. But, as you said, I'm not going to allow you to do it because you waived it under – under London. I know it's not precedential, but this – but this Court's decision in Pack from last fall is directly on point. And even if it's not precedential, the analysis is dead on. The analysis says we have never, ever held that the Waiver Rule in London, which we acknowledge is formalistic, but the – we've never held that the Waiver Rule in London precludes the liberal – the liberality of pleading under section – under Rule 15a. And as a reserve – You have 50 seconds. Do you want to reserve? I'll reserve. All right. Thank you. May it please the Court. George Riley for Apple. I'd like to divide my argument between the claim for damages and the claim for equitable relief, because I believe the plaintiff is conflating those two issues, because the complaint is very clear. They're seeking damages here, and then they have a separate prayer for equitable relief. And with regard to damages, they have to show standing, and they have to show a direct claim. And in the complaint – and the complaint is very clear about this – the section 14a claim, the alleged injury is pled in paragraphs 276 and 277. And it says, loss, causation, allegations. And with regard to their section 14, their only federal claim, they are challenging one vote, the vote that was taken in 2005, which increased the ceiling for the number of authorized option shares. That's the sole basis for their loss causation, is one vote in 2005. And their claim is it caused dilution. Dilution – the cases are uniform. Dilution is not the basis for a direct claim for damages. J.P. Well, you can't recover on a theory of dilution even if it were a direct claim. Isn't that what the law is? That is correct. You cannot – the damage that is incurred by dilution is incurred by the corporation. J.P. Morgan is – Okay. You could put it that way, I guess. It's not a claim – it's not some loss that the shareholder has sustained. And in a direct claim, you have to allege a loss to the shareholder. Now, it seems to me – I'm just a third of the court, half of those presently sitting today – but anyway, it seems to me that if there is a breach of the duty of disclosure, a denial to an informed vote of the shareholders, that's a direct claim that the shareholder would have. And then the shareholder would have to come forward and prove some element of damage. And you're saying dilution is not an element of a shareholder's damage. Exactly. Okay. J.P. Morgan, right on point, and the uniform decisions from Delaware and California. Were there any other claims of damage to shareholders other than by dilution? If you look at the complaint, paragraphs 276, 277, which deals only with section 14a, the only alleged harm is the causing of dilution. In their prayer for relief, they ask for equitable relief in addition to damages. But they ask for money damages. How can you tell us about the equitable relief? Yes. Before we leave dilution, though, it seems to me that the argument here is slightly different than a classic dilution argument. The argument seems to be this, that the shares were diluted. Well, the fact of the dilution of the shares affected stock price, and we can prove it. Now, if that's true, why isn't that a direct damage to the shareholder? First, that's not what is alleged. No, but I'm... All right. And secondly, is J.P. Morgan... But if he's granted leave to amend, and he alleges that, why doesn't that work? Because the question is, who is the primary injured party by dilution? And J.P. Morgan says, you answer that question by saying, what would happen if you undid the transaction? Would the corporation be the primary beneficiary, or would it be separate benefits to the shareholders? If you were to unscramble this huge omelet, the shares would be returned to Apple. That means that the injury is Apple's, and the claim can only be pursued as a derivative claim. I understand that theory. And there is language in J.P. Morgan that supports it. But I think, supposing that they produce expert testimony that says, taking all those events, if the shares are returned to Apple, we're going to benefit. Or, conversely, we were damaged, and you can pay us for the difference in stock price caused by the actions that caused dilution of shares. Why doesn't that work? Because, again, under Tyson, J.P. Morgan, whole line of cases, you don't pay twice. If the corporation has been injured by the transaction, and you can unscramble it, that is the only recovery. The shareholders only benefit indirectly, which is the very nature of the dilution claim, is that their interests rise or fall with the corporation's issuance of its equity shares. And that would be true of any remedy in this case. And, again, the cases are absolutely uniform. In Morgan, they issued $6 billion worth of shares. Huge dilutive effect. And the court said, your claim for dilution is a claim that has to be pursued derivatively. Okay. Why don't you turn to your equitable claims? On the equitable claims, again, with regard to the loss causation, they don't even plead the equitable claims. They are stuck in the prayer where they say, let's rescind the options. Well, under Section 14A, given the statute of limitations, the only claim for equitable relief that they Now, to show you how incredibly attenuated this is, the last backdated option they allege took place in 2002. So they're claiming if Apple had disclosed that it had backdated options under a prior plan three years before the vote, the shareholders wouldn't have voted to increase the ceiling. Now, they haven't suffered any direct harm at all from that vote, because those options in 2005 are issued properly, the employees serve the time necessary to exercise the options, they pay the price under the option plan. So there's no damage that results from the vote in 2005. But what further negates any form of equitable relief in this case is the vote that was taken in 2007 by Apple shareholders. In 2005, the vote that they are challenging increased the ceiling under two different plans. Under the stock option plan, it increased the ceiling to 145 million shares. Under the employee stock option, under the employee stock purchase plan, where you buy stock out of your payroll deductions, they increased the ceiling to 70 million shares. In 2007, after all the backdating issues were thoroughly vetted and disclosed, the shareholders voted to increase those ceilings from 145 million to 173 million, from 70 million to 74 million. And by doing that, they superseded the earlier amendments. So our shareholders, by a huge majority, after disclosure of all the past misconduct, increased the ceiling. Today, the legal ceiling on stock option shares is 173 million and 74 million under the stock purchase plan. That moots any claim of equitable relief, because after full disclosure, the shareholders agreed to increase the ceilings on the number of shares that are reserved for issuance, so they don't have an equitable claim. I'd like to turn, if I can, to the waiver, unless the Court has more questions about this. The issue on waiver, very different than PAC, the plaintiff in this case made a conscious, deliberate, strategic decision to drop the 10B claims, because they characterized them, disparaged them as de minimis. And they did this as part of their effort to be appointed lead plaintiff and lead counsel. They voluntarily dismissed their claims. By contrast, in the case that they cite, the unpublished decision, the plaintiff in that case was told by Judge Walker, you haven't alleged sufficient claims for misrepresentation in 1999, I'm going to dismiss the claims. And don't you reallege them unless you have facts to back them up. So it was an involuntary dismissal. The plaintiff realleged claims based on 2,000 misrepresentations in 2000. The Court granted summary judgment, and then the plaintiff said, I've done discovery, I want to go back and reallege misrepresentations that occurred in 1999. So it wasn't a voluntary, strategic decision to jettison claims to win a favored position in the litigation. It is hard to see how London applies in the District Court context, though. In the District Court relied on London, it's really difficult for me to see how that applies at all. I mean, they're fundamentally different procedures, they're fundamentally different operations. I can understand why a District Court would or could say, you're too late, this is untimely, things have happened, discovery's had, we closed it. But instead, the District Court relied on London, which, as I say, it's really hard for me to see how that can possibly apply in the case that we cite, applied it at the District Court level. In that case, the plaintiffs, indigent pro se plaintiffs, had made an allegation, it was dismissed. They made a new complaint, didn't reallege their causes of action, their complaint was dismissed. And they said, well, wait a minute, we had this prior claim, and the Court said, you've waived it, and that was at the time, a completely suitable alternative basis for Judge Fogel's decision to deny leave to amend, which is the Allen case. In that case, as in this case, the plaintiff came forward on an amended complaint and said, look, I've got a new theory I want to present, no new facts, no change in circumstance at all. And this Court said it was proper to deny leave to amend under those circumstances because the plaintiff couldn't provide any reasonable explanation that would resonate in concerns of judicial efficiency to bring the claims back again. Right. But if the District Court wanted to rely on Allen, it could have. If the District Court really believed that London controlled, then that's an error of law, I think. And we'd have to give the Judge Fogel a chance to reexamine it, perhaps in light of Allen or any other considerations. Right. Certainly, that's the case. I mean, the flip side of that is, why do you think on an abuse of discretion review of a motion, a denial of motion for leave to amend, that we should insert a new reasoning, a new reasoning that the District Court didn't rely on? Because this Court has the authority to do just that, which is if there is a reasonable basis in the record to support. Well, in some of our judgment we do, but on this kind of discretionary decision, when the District Court thought it was legally bound, it is something different. The Court – Judge Fogel did not say he was legally bound. He uses permissive terms. The Court may determine that they have waived their claim. It was clearly permissive, and the Court looked at other factors, including the impact on the defendants of allowing them to re-raise a claim that they voluntarily dismissed to advantage their position in the litigation. So the Court did not apply a rigid rule, it's waived for all purposes. The Court examined the reasons for the waiver, and under Allen, this Court can look at the record, and I believe, as you've noted, there are other grounds to sustain the denial of leave to amend. Primarily, as in Allen, their failure to provide any explanation at all, other than the strategic explanation, for the decision to jettison the claims, and then to try to bring them back again. And there needs to be consequences for decisions like that in court. As this Court has said, you shouldn't hold the claims in your hip pocket and spring them on you later in litigation. That would defeat the purposes of the liberal pleading rules under the federal rules. They should be held to the consequences of their strategic decision to dismiss those claims. Okay, I think we have your argument, and any further questions? Anything else? No, thank you very much. Thank you. Your Honor, very quickly, first, on the dilution claim, I have to be very clear. J.P. Morgan and the whole line of cases, TriStar, Gentile, all of those involve claims of corporate overpayment that are derivative claims. The argument that you can't recover dilution on a direct claim because it's derivative presupposes that it's a derivative claim. Please read those cases, they go through very clearly and talk about overpayment. That's the only way it made sense for Judge Fogel to analyze them that way. Second, he says that we're going to ask for shares to be returned to Apple, and that's why the benefit goes to Apple. We haven't asked for a single share to be returned to Apple, not a single option contract to be canceled. That's just a plain misrepresentation. Second of all, finally, he talks about the ratification. A, he didn't raise that at the district court, so it shouldn't be considering it here. B, his arguments about how tenuous it was, I think it's an issue of materiality, which could be an issue of fact, again, which shouldn't be considered here. Finally, on the amendment point, he says Allen applies. Allen, by the way, doesn't apply because the district court didn't look at it. Second, that was a fourth amended complaint in Allen. In this case, Nysers filed one complaint. Third, there's no to the extent that the court considered reasons, inadequate reasons, the court rejected the very arguments he's making today on the reasons, the strategic reasons that Nysers had waited to assert a 10b claim and finding that otherwise they should be permitted to amend under Rule 15a. Finally, under the London issue, he says King v. Itaeth applied it at the district court. They did not. There was no motion to amend in the King case. He never moved to amend under 15a. Whether or not it would have been granted, that's one thing, but it simply did not happen. With that, Your Honors, I'd submit it. Thank you both for your arguments and briefing. The case history will be submitted. A lot of interesting issues in the case.
judges: Aldrich, Thompson, Thomas